Filed 3/13/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063648 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS255148) |
| MELVIN JAMES ANDERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, William W. Wood, Meagan J. Beale and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.B., C., and D.

I.

INTRODUCTION

A jury convicted Melvin James Anderson of residential burglary (Pen. Code, §§ 459, 460)[1]; first degree robbery (§§ 211, 212.5, subd. (a)); assault with a firearm (§ 245, subd. (a)(2)); and being a felon in possession of a firearm (§ 29800, subd. (a)(1)). The jury found true allegations that Anderson personally used a handgun within the meaning of section 12022.5, subdivision (a) in the commission of the burglary and assault, and personally used a handgun within the meaning of section 12022.53, subdivision (b) in the commission of the robbery. Anderson admitted that he had incurred three prison priors (§ 667, subd. (b)); one serious felony prior (§ 667, subd. (a)(1)); and one strike prior (§§ 667, subds. (b)-(i), 1170.12).

Anderson contends that (1) the trial court erred by failing to instruct the jury on a claim-of-right defense; (2) the court erred by admitting impeachment evidence regarding his prior gun use and possession, which the court had previously ruled inadmissible, and defense counsel rendered ineffective assistance by failing to object to the prosecution's irrelevant examination that was designed to open the door to that impeachment evidence; (3) the court prejudicially erred in allowing the prosecution to impeach him with a 23-year-old prior robbery conviction; (4) the cumulative effect of the above errors deprived him of due process; and (5) his burglary sentence should have been stayed under section 654's prohibition against multiple punishment for crimes arising out of a single act. The

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

People concede that Anderson's burglary sentence should have been stayed under section 654. We will modify the judgment accordingly and affirm the judgment as modified.

## II.

## FACTS

At the time of the incident giving rise to the charges in this case, Anderson lived with his cousin, Kellie Thomas, and her three children. Gregory Moore and his girlfriend, Niya Watson, who is a cousin of both Anderson and Thomas, had previously lived with Thomas and her children. Moore and Watson testified that Thomas abused prescription pills, and that Moore occasionally provided Thomas with Vicodin pills that were prescribed for him when they lived together. Thomas sometimes paid Moore money for the Vicodin pills and sometimes paid him for the pills by letting him use her electronic benefit transfer (EBT) card[2] to buy food. When Thomas's mother, Diane Sawyer, found out that Moore was giving Thomas Vicodin, she asked Moore and Watson to move out of Thomas's apartment, and paid them $200 to expedite their move.

After Moore and Watson moved out of Thomas's apartment, Moore continued to provide Thomas with Vicodin from his prescriptions, and Thomas occasionally paid Moore for the pills by letting him purchase food with her EBT card. Moore testified that he would "front" Thomas the pills and Thomas would pay him with the EBT card "about a week or so later." On March 1, 2012, Thomas met with Moore and Watson at a grocery store across the street from her residence to give them the EBT card as payment for

---

[2] Moore referred to the EBT card as a "food stamp card."

3

Vicodin that Moore had given her earlier in the week. Thomas agreed to allow Moore to spend $200 on the card for food. Thomas also paid Moore $300 in cash toward an $800 debt for pills that he had given her and money that he and Watson had loaned her. After Thomas bought groceries for her household, she gave Watson the EBT card and told her that she could spend "$200 off the EBT card." Moore would normally "go right to the store" when Thomas let him use her EBT card, and would return the card to Thomas within a couple of hours. However, when Thomas gave Watson the card that day, Moore did not have time to shop because he had a "previous engagement" and "other things to do." Consequently, he and Watson drove home with the EBT card and Thomas walked home.

After Moore and Watson returned to their apartment, Anderson called Watson and asked her if she had Thomas's EBT card. Thomas later sent Moore and Watson several text messages telling them that she, Anderson, and Sawyer were on their way to Moore and Watson's apartment to retrieve the card. Thomas told Moore that they were going to bring him $200 in cash in exchange for the card.

Anderson arrived at Moore and Watson's apartment and knocked on the door. Moore opened the door with the EBT card in his right hand. Anderson said, "Yo, man. I need that card." Moore replied, "Okay, well, where is the $200?" Anderson said that he did not have the money, but would give it to Moore later. Moore told Anderson that he needed to buy food before he returned the card and turned to close the door. Anderson pushed the door open and hit Moore on the head with what appeared to Moore to be a

4

"skull cap," which Moore explained is a "beanie that you put over your skull." The blow caused Moore to lose his balance and stumble. As he stumbled, he saw a gun clip fall out of the cap onto the floor, and saw Anderson pick up the clip. Moore then heard the sound of a clip being inserted into a gun.

Watson testified that she saw the gun clip on the floor and saw Anderson pick up the clip and insert it into a black gun. She yelled at Anderson and told him to get out of her house. In response, Anderson said, "Get the fuck out of my face. Get back. You will get hurt, too." Before he left the apartment, Anderson pushed Watson, pointed the gun at her and said, "I ought to rob you right now."

Medical assistant Shawn Ireland and a doctor were making a house call at an apartment located down the hall from Moore and Watson's apartment when the altercation between Anderson, Moore, and Watson occurred. Ireland and the doctor heard yelling and screaming coming from down the hall. The doctor told Ireland to "go break that up." Ireland went into the hallway and walked toward Moore and Watson's apartment. As he approached their door, he said something to the effect of, "Hey, hey, guys, calm down." Anderson, who was standing in the doorway, turned around and looked at Ireland. Ireland saw a pistol in Anderson's right hand. He was familiar with guns and recognized the gun in Anderson's hand as a semiautomatic "Glock" type of pistol. Anderson was holding the gun by the barrel with the handle sticking out the backside. When Ireland saw the gun, he backed away from Anderson, returned to his patient's apartment, and called 911. A few minutes later, the police arrived at Moore and

5

Watson's apartment. Moore told the police that he had received his welfare check that day and that Anderson had probably come to his home to rob him.

*Anderson's testimony*

Anderson testified that he lived with his cousin, Thomas, and her three children and was employed as an in-home caregiver. He testified that Thomas was a "sickly person" and is mentally "slow." He helped Thomas by making sure that she shopped for groceries for the children, got the children to school, made it to her medical appointments, and cleaned herself and the children. Thomas's mother, Sawyer, told Anderson in late 2011 that Thomas had a drug problem. Anderson tried to talk to Thomas about the problem and began to watch her more closely. Watson and Thomas told Anderson that Thomas was getting pills from Watson, and Anderson knew that Watson was getting the pills from Moore. Anderson spoke with Moore about providing Thomas with pills. He asked Moore, "Why would you guys do this to your family?" Moore responded, "I need my money. I've got to live too."

After Thomas was hospitalized in December 2011 as a result of a drug overdose, Anderson began monitoring her money. Thomas gave Anderson her bank card and EBT card, but he later returned them to her when he "noticed that she was doing better." However, he continued to monitor her use of the EBT card by asking her for receipts.

The day before the March 1 incident, Sawyer and Anderson became concerned because Thomas was missing and Sawyer discovered that money had been withdrawn from Thomas's bank account from a 7/11 store across the street from Moore and Watson's

6

apartment.  Anderson suspected that Moore and Watson were selling drugs to Thomas again.  When Thomas came home, Anderson searched her and found Vicodin pills in her pocket.  Anderson was upset.  He took the pills and Thomas's cards from Thomas, but returned the cards that night.

The next day, Anderson and Sawyer confronted Thomas and asked her where the money missing from her account and her EBT card were.  Thomas said that she had paid bills with the money.  She pretended to look for her EBT card for a few minutes, but eventually admitted that Moore and Watson had the card.  Anderson "started arguing" with Thomas and expressing disapproval that she had allowed Moore and Watson to take the card.  Thomas responded, "Well, she snatched it.  It was two of them and just me.  What was I going to do?"  Sawyer suggested that they go to Moore and Watson's apartment to retrieve the EBT card and told Thomas to "tell them we're coming to get the card."  Thomas sent a text message to Moore and Watson while Sawyer, Anderson and Thomas drove to their apartment.  Anderson testified that he did not have a gun.  He explained that he wore a knife attached to his belt on his right hip, and wore a cell phone holder behind the knife.

Anderson arrived at Moore and Watson's apartment and knocked on the door.  When Moore opened the door, he was holding Thomas's EBT card in his hand.  Anderson said, "I'm going to need that."  Moore turned to Watson and asked her if he should give Moore the card.  Watson said, "No, no.  Hell no."  Anderson reached for the card and

Moore held onto it.  They both pulled on the card, but Anderson won the "struggle" and left with the card.

Anderson testified that he did not hit Moore over the head with a gun or with anything else, and said that he did not own a gun.  When Anderson was asked if Moore fell during the struggle, he answered, "I'm not sure what happened when I left.  He was kind of, like, hurling towards the bathroom."  Anderson added that Moore was not steady on his feet during the struggle and seemed "kind of scared," "slow," and "groggy."  When Anderson was shown a photograph of Moore with blood on his head after the incident, he testified that he might have caused Moore to fall because Moore was unstable, but he denied that he had hit Moore on the head.

III.

DISCUSSION

A.    *Failure to Instruct on a Claim-of-Right Defense*

Anderson contends that the trial court erred by failing to instruct the jury on a claim-of-right defense under CALCRIM No. 1863.  "The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938 (*Tufunga*).)  However "the [claim-of-right] defense is not permitted where the claimed right to the property is rooted in a 'notoriously illegal' transaction." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1144.)  Also, "[i]n furtherance of the public policy discouraging the use of forcible self-

8

help" (*Tufunga, supra*, at p. 950), the claim-of-right defense does not extend to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated—as opposed to forcible takings intended to recover specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title . . . ."  (*Id.* at p. 956.)[3]

    " '[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that appellant *acted* with a subjective belief he or she had a lawful claim on the property.'  [Citation.]  Whether or not the evidence provides the necessary support for drawing that particular inference is a question of law.  [Citation.]  Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the

---

[3]    CALCRIM No. 1863 delineates the claim-of-right defense as follows:  "If the defendant obtained property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery).  [¶]  The defendant obtained property under a claim of right if (he/she) believed in good faith that (he/she) had a right to the specific property or a specific amount of money, and (he/she) openly took it.  [¶]  In deciding whether the defendant believed that (he/she) had a right to the property and whether (he/she) held that belief in good faith, consider all the facts known to (him/her) at the time (he/she) obtained the property, along with all the other evidence in the case.  The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith.  [¶]  [The claim-of-right defense does not apply if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered.]  [¶]  [The claim-of-right defense does not apply to offset or pay claims against the property owner of an undetermined or disputed amount.]  [¶]  [The claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal.]  [¶]  If you have a reasonable doubt about whether the defendant had the intent required for (theft/ [or] robbery), you must find (him/her) not guilty . . . ."

requested instruction where the supporting evidence is minimal and insubstantial. Doubts as to the sufficiency of the evidence should be resolved in the accused's favor." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145, fn. omitted.)

We conclude that the trial court properly refused the claim-of-right instruction because Anderson did not act to retrieve the EBT card from Moore and Watson with the belief that *he* had a lawful claim to the card. The claim-of-right defense is generally limited "to the perpetrator who merely seeks to effect what he believes in good faith to be the recovery of specific items of *his own* personal property." (*People v. Waidla* (2000) 22 Cal.4th 690, 734, fn. 12, italics added.)

Anderson argues that he was entitled to a claim-of-right instruction under the reasoning of *People v. Williams* (2009) 176 Cal.App.4th 1521, 1528–1529 (*Williams*), in which the Third District Court of Appeal extended the claim-of-right defense to a defendant who was tried as an aider and abettor to a principal who acted to recover property under a good faith belief that he had a right or claim to the property. The *Williams* court explained that "[i]t would defy logic and common sense to hold that a defendant who absconds with goods by force under a good faith belief that he was repossessing his own property does not thereby commit robbery, but that his accomplice, who assists him in the same act and shares the same intent, may be found guilty. The latter, just as surely as the former, lacks the specific intent to deprive another of his or her property." (*Id.* at p. 1528.) Accordingly, the *Williams* court held that "a good faith belief by a defendant, tried as an accomplice, that he was assisting his coprincipal retake the

10

principal's property negates the 'felonious intent' element of both larceny and robbery, and that an instruction on the claim-of-right defense must be given where substantial evidence supports such a belief." (*Id.* at pp. 1528–1529.)

Anderson contends that under the reasoning of *Williams*, he was entitled to a claim-of-right instruction based on the evidence that he was assisting Thomas in recovering her EBT card when he forcefully took the card from Moore.  Anderson argues that if he believed the card rightfully belonged to Thomas when he recovered it, his belief would negate the specific intent required to support his burglary and robbery convictions. Anderson would thus have us hold that the claim-of-right defense extends to a defendant who acts to recover property as an *agent* of the owner of the property just as it does to a defendant who aids and abets the owner in the recovery of his or her property.[4]  We decline to extend the claim-of-right defense that far.

---

[4]     Anderson's trial counsel contended that Anderson was entitled to the claim-of-right instruction as Thomas's agent.  Trial counsel argued:  "[Anderson] was acting as an agent of [Thomas] by accompanying [Thomas] to the house, going up the elevator with [Thomas].  [Thomas] showed [Anderson] the door where Greg Moore and Niya Watson live.  [Thomas] then walked down to the elevator and waited while [Anderson], as an agent for [Thomas], knocked on the door to get the EBT card."

At oral argument, Anderson's appellate counsel stated that Anderson *was not* claiming that he had acted "as an agent of a putative third party owner," but rather, that he was effectively an accomplice of Thomas, since she had "recruited" him to go to Moore and Watson's apartment with her to retrieve the EBT card.  Counsel argued that *Williams* applies to this case because Thomas was a "de facto accomplice" who could have been charged with the robbery along with Anderson.  Counsel admitted that Anderson's trial counsel did not make this argument to the trial court.  When asked if Thomas had done anything to instigate the trip to Moore and Watson's apartment to retrieve her EBT card, counsel cited the evidence that Thomas told Anderson that Moore snatched the card from her, and that she told Anderson how to get to the apartment.

The California Supreme Court in *Tufunga* noted that "[t]he legitimacy of the need for our laws to discourage forcible or violent self-help as a remedy seems beyond question." (*Tufunga, supra,* 21 Cal.4th at p. 953.) " ' "It is a general principle that one who is or believes he is injured or deprived of what he is lawfully entitled to must apply to the state for help. Self-help is in conflict with the very idea of social order. It subjects the weaker to risk of the arbitrary will or mistaken belief of the stronger. Hence the law in general forbids it." ' " (*Id.* at pp. 952-953.) The *Tufunga* court refused to extend the claim-of-right defense to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated" (*id.* at p. 956) in large part because doing so would be contrary to the strong public policy against self-help by force or fear. (*Id.* at pp. 953-956.) We conclude that the same public policy similarly precludes extension of the claim-of-right defense to a defendant who has no right or claim of ownership to the property that he is accused of stealing, and who maintains that he acted as an agent of a third party who was the rightful owner of the property but was not a coprincipal in the commission of the charged offenses. To allow defendants who claim to have committed theft or robbery as agents for third parties to assert a claim-of-right defense based on the

---

The People responded that there was no evidence that Thomas was an aider and abettor, and cited Anderson's testimony to the contrary at trial. On cross-examination, when asked whether he had admitted to the police that "it was all you," Anderson answered "yes," and admitted that he "decided to do it." He further admitted that he "asked [Thomas] to point out the apartment for [him]" and told Thomas and Sawyer to "wait off to the side" because he did not want them to be involved in his "getting the EBT card back." The record does not support Anderson's counsel's assertion at oral argument that Thomas "recruited" Anderson to retrieve her EBT card and acted as his accomplice in the commission of the charged offenses.

12

belief that the third party has a right or claim to the property taken would be contrary to the strong public policy against forcible self-help, because it would condone the type of self-help that subjects the weaker to the risk of being victimized as the result of mistaken belief or arbitrary will of the perpetrator or the third-party "principal."[5] The trial court did not err in refusing to give the jury a claim-of-right instruction.

B.    *Admission of Anderson's 1989 Robbery Conviction for Impeachment*

Anderson contends that the trial court prejudicially erred by ruling in limine that the prosecution could impeach him with a 23-year-old prior robbery conviction. In the alternative, he contends that if admission of the 1989 robbery was proper, the court erred in refusing his request to sanitize the conviction by referring to it only as a prior theft-related conviction. As noted, the court ruled in limine that Anderson's 1989 robbery conviction was admissible for impeachment. The court excluded a 1986 robbery conviction and Anderson's 2000 gun possession conviction. We conclude that the court did not abuse its discretion in admitting the 1989 robbery conviction, and did not prejudicially err in refusing to sanitize the conviction.

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of

---

[5]    We do not hold that the claim-of-right defense can never be available to a defendant charged with theft or robbery where there is evidence that the defendant took the subject property on behalf of a third party whom the defendant believed to be the rightful owner of the property. There may be circumstances where the defendant acts on behalf of a third party and the rationale for the defense outweighs the public policy against forcible self-help. However, such circumstances are not present in this case.

discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931 (*Clark*).) In exercising its discretion, the trial court must consider the following four factors specified in *People v. Beagle* (1972) 6 Cal.3d 441, 453: "(1) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of the impeachment by prior convictions. [Citation.] These factors need not be rigidly followed." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*Clark, supra,* at p. 932.)

Anderson contends that the 1989 robbery conviction was not probative of his honesty. However, robbery is a crime of moral turpitude (*People v. Collins* (1986) 42 Cal.3d 378, 395), and "California courts have repeatedly held that prior convictions for burglary, robbery, and other various theft-related crimes are probative on the issue of the defendant's credibility." (*People v. Mendoza, supra,* 78 Cal.App.4th at p. 925, and cases cited therein.) Thus, Anderson's 1989 robbery conviction was "clearly probative on the issue of his credibility and this factor would not favor the exclusion of the [conviction]." (*Ibid.*) The 1989 robbery conviction was particularly probative in light of the fact that

14

Anderson's "line of defense at trial was an outright denial of guilt, i.e., his credibility was directly at issue." (*Ibid.*)

Anderson next argues that the 1989 robbery conviction was not probative because it was remote in time. Although a 23-year-old prior conviction is clearly remote in time (*People v. Burns* (1987) 189 Cal.App.3d 734, 738 ["a conviction that is 20 years old . . . certainly meets any reasonable threshold test of remoteness"]), it is well established that "convictions remote in time are not automatically inadmissible for impeachment purposes. Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior." (*People v. Mendoza, supra,* 78 Cal.App.4th at pp. 925-926.)

The remoteness factor does not militate against admission of Anderson's 1989 robbery conviction because he has not led a legally blameless life since that conviction. In a presentencing statement in aggravation, the People noted that Anderson was in custody after his 1989 robbery conviction until September 1995. He violated his probation and was remanded to prison from March 1998 to March 1999. In 2000, he was convicted of being a felon in possession of a firearm and was incarcerated until June 2007. During that incarceration, he was twice convicted of possession of marijuana. The weight to be given to the remoteness factor is a matter for the trial court to resolve in the exercise of its broad discretion. (*People v. Mendoza, supra,* 78 Cal.App.4th at pp. 925-926.) In light of Anderson's criminal history following his 1989 robbery conviction, we

15

cannot say that the trial court's decision to allow impeachment with the conviction was an abuse of discretion based on the age of the conviction.

Finally, Anderson contends that admission of the 1989 robbery conviction was extremely prejudicial because it involved the same offense as charged in the present case. "Although the similarit[ies] between the prior convictions and the charged offenses [are] a factor for the court to consider when balancing probative value against prejudice, it is not dispositive." (*Clark*, *supra*, 52 Cal.4th at p. 932.) In *Clark*, the Supreme Court upheld the trial court's admission of the defendant's two prior robbery convictions that were similar to charged robberies because "there were no other prior felony convictions involving moral turpitude that could have been admitted for impeachment purposes." (*Ibid.*) The Supreme Court reasoned that "to exclude the robbery priors would have clothed defendant in a ' " ' "false aura of veracity." ' " ' " (*Ibid.*; accord *People v. Hinton* (2006) 37 Cal.4th 839, 888.)

The same analysis applies in the present case. The trial court exercised its discretion to exclude Anderson's 1986 robbery conviction on the grounds that "it's too old and it's committed as a juvenile." If the court had not admitted the 1989 robbery conviction, there would have been no other prior conviction involving moral turpitude that could have been admitted for impeachment purposes. Thus, exclusion of the 1989 conviction would have clothed Anderson in a false aura of veracity. The court did not abuse its discretion in admitting Anderson's 1989 robbery conviction.

16

With respect to Anderson's contention that the trial court erred in refusing his request to sanitize the conviction by referring to it only as a prior theft-related conviction rather than as a robbery, the trial judge informed the parties that he does not sanitize convictions. During argument on in limine motions, the court stated, "I'll tell you upfront I don't sanitize. If I'm going to give them, I do not sanitize convictions. . . . [¶] I'm not going to sanitize." The court explained that if it sanitized a robbery conviction by referring to it simply as a felony or a crime involving moral turpitude, the jury "might think it's rape or murder, which is even worse. So I don't sanitize." The court asked the prosecutor, "I don't think you want it sanitized?" The prosecutor answered, "Right." The court then asked defense counsel, "Ms. Kirkwood, do you if I give them?" Defense counsel responded, "No, your honor."

In light of the court's reasonable explanation of why it was not inclined to sanitize Anderson's prior conviction and defense counsel's agreement to not sanitize any prior convictions admitted at trial, we do not find an abuse of discretion in the court's not sanitizing the 1989 robbery conviction. In any event, as we discuss below, Anderson opened the door to the facts underlying the 1989 conviction, and the prosecutor cross-examined him about those facts. At that point, the issue of whether the court should have sanitized the 1989 conviction became moot.

C.    *Impeachment Evidence Regarding Prior Gun Use*

Anderson contends that the trial court erred by allowing the prosecution to cross-examine him regarding his prior gun use to impeach his credibility. In the alternative,

17

Anderson contends that his counsel rendered ineffective assistance by failing to object to the prosecution's irrelevant examination that he claims was designed to open the door to that impeachment testimony.

1.     *Admission of the evidence*

The prosecution moved in limine for permission to impeach Anderson with his prior convictions in the event that he elected to testify.  The prosecution also moved to admit the facts underlying Anderson's 1989 robbery conviction to circumstantially prove intent, common plan, scheme and modus operandi under Evidence Code section 1101, subdivision (b).  Specifically, the prosecution requested permission to elicit testimony from Anderson that during the commission of the 1989 robbery, he "personally used a firearm, striking [a victim] in the face to effectuate his intent to permanently deprive her of her property when she briefly resisted."  Over defense counsel's objection, the court ruled that Anderson's 1989 robbery conviction would be admissible for impeachment, but that the prosecution would not be allowed to question Anderson about the facts underlying that conviction, unless Anderson testified to the effect that he had a peaceful nature.[6]  The court excluded Anderson's other prior convictions.

---

[6]     The court stated, "If Mr. Anderson gets up on that stand and makes contentions 'I would never hit anybody.  I wouldn't harm a fly.  I'm a peaceful Quaker.  I've never harmed anybody.  Never raised my hand in anger[,]' of course you will tell me[,] 'Can we go sidebar, I [have] proof he hit someone in the head with a shotgun.'  Of course then I'll allow it, but not until the door is open.  So depending on what Mr. Anderson says, he gets on that stand at his own peril.  He wants to . . . talk like I'm an altar boy. . . .  I might say 'go for it.'  But until I hear it, you're prohibited from using it in your case-in-chief."

As noted in the statement of facts, Anderson testified on direct examination that he did not have a gun when he went to Moore and Watson's apartment on the day of the incident, and maintained that he did not own a gun. However, he wore a knife that attached to his belt on his right hip, and wore a cell phone holder behind the knife. His counsel showed him a close-up photograph of the knife and the cell phone case and then questioned him as follows:

"Q: Now, the witness, Mr. Ireland, said you had your hand down toward your waist, correct?

"A: Right.

"Q: So when Mr. Ireland was down the hall walking toward [Moore and Watson's apartment], you were in the doorway, was your hand down at your side?

"A: It could have been.

"Q: So it would be covering the brown part of the knife?

"A: Could have been.

"Q: And it would have looked like a black –

A: Yes."

Based on Ireland's testimony that he saw a gun (Glock) in Anderson's hand, we presume that the purpose of counsel's questioning was to suggest that Ireland may have mistaken Anderson's knife and cell phone for a gun, and that if counsel had finished the last quoted question, it would have been, "And it would have looked like a black gun [or Glock]?"

19

On cross-examination, the prosecutor addressed that point as follows:

"Q: It's your testimony that on that day . . . you were wearing that knife; is that right?

"A: Right.

"Q: And also the cell phone carrier; is that right?

"A: Yes, sir.

"Q: Melvin, you know what a gun looks like, don't you?

"A: I do.

"Q: Does that look like a gun?[7]

"A: It doesn't.

"Q: Not at all, right?

"A: You know, it could.  Yeah, now that I'm looking at it again it does.

"Q: Come on.  Does that look like–

"A: If I look fast.

"Q: Does it look like a Glock?

"A: No, doesn't look like no Glock.  But I don't know what all Glocks look like. I'm not that familiar with guns myself.

"Q: What does that look like to you?

"A: I know what it is so I know what it looks like.

---

7    The prosecutor presumably was referring to the photograph of Anderson's knife and cell phone case that his counsel had shown him on direct examination.

"[Defense counsel]:  Objection.  Argumentative.

"The Court:  Sustained.

"Q:  Does this look like a Glock?

"A:  I heard all Glocks are black.

"Q:  You heard?  You don't know?

"A:  I don't know about guns and magnitudes of guns.  I don't know.

"Q:  You don't know about guns?

"A:  No, I don't.

"Q:  Does that look like a gun?

"A:  No.

"Q:  When I put the two of them together, does that look like a gun?

"A:  No.

"Q:  Okay.  And Melvin, you have been previously convicted back in 1989 of robbery; is that right?

"A:  True.

"[Defense counsel]:  '89.

"[Prosecutor]:  1989.

"[Defense counsel]:  Yes, 23 years ago.

"[Prosecutor]:  Thank you.

"By [the prosecutor]:

21

"Q: So you've never been in possession of any other drugs and you don't know anything about guns?

"[Defense counsel]: Objection. Misstates the testimony, your honor. Compound.

"The Court: Let's break it down one at a time.

"By [the prosecutor]:

"Q: You don't know anything about–you don't know anything about guns, right?

"[Defense counsel]: Objection. Misstates the testimony.

"[Prosecutor]: I'm asking.

"The Court: Overruled. That one's missing from the last sentence. You may go ahead.

"[Anderson]: No."

The prosecutor later requested a sidebar conference to ask the court's permission to impeach Anderson with the facts pertaining to his prior convictions involving guns, including his use of a shotgun in the 1989 robbery and his gun possession in 2000. The prosecutor argued that the evidence was admissible to impeach Anderson because he had "opened the door" to it by testifying that he was not familiar with guns. The prosecutor further argued that the fact that the two prior convictions involved guns showed that Anderson was familiar with, and had at least some knowledge about, guns. The trial court agreed and allowed the prosecutor to cross-examine Anderson regarding his prior knowledge, possession, and use of guns.

22

After the sidebar conference, the prosecutor elicited testimony from Anderson that he had used a shotgun with a pump during the 1989 robbery. Anderson testified, "I have been in possession of three guns my whole life. I don't know the names of them. I don't know what kind they were. I don't know." The prosecutor asked Anderson whether he had three guns in 1989 and Anderson responded that he did not "have three guns" but had "seen" three guns. When the prosecutor asked Anderson whether he had used one of the guns, Anderson answered, "I never used the gun. I held it. I never used the gun." Anderson later admitted that he had "used" the gun and added, "I guess you can say I used it in a threatening manner." He testified that he robbed a store with two accomplices and held the store manager on the ground with the shotgun, and that the store manager "kept lifting her head up, lifting, looking at my crimies."[8] The prosecutor attempted to get Anderson to admit that the store manager had "tried to push away from [him]" and that "[w]hen she pushed away, [Anderson] crashed her in the head with the butt of that gun . . . ." Anderson said, "Didn't go like that," and the prosecutor continued, "Just like you did in this case right?" Anderson responded, "No sir." At that point the court interjected, saying, "All right. Let's curtail the rest of this cross-examination. Let's move on."

Regarding his conviction in 2000 for possessing a gun, Anderson testified that the gun fell off the back tire of his car when his car was towed because he had been charged

---

[8]   Anderson explained that "crimies" are "people that are committing a crime with me."

with another crime.  He said that he had never seen the gun before, and that he was charged with possessing it because it was on the back tire of his car.   Anderson testified, "The person with me was claiming the gun, but because they didn't have a history they didn't let him take that case.  They gave it to me because I had a history.  That was after '89 so I had a history."

"As with all relevant evidence, . . . the trial court retains discretion to admit or exclude evidence offered for impeachment.  [Citations.]  A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

"Evidence tending to contradict any part of a witness's testimony is relevant for purposes of impeachment."  (*People v. Lang* (1989) 49 Cal.3d 991, 1017; Evid. Code, § 780, subd. (i).)  Thus, "a witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony."  (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946.)

A defendant who testifies puts his credibility in issue and is subject to impeachment in the same manner as any other witness.  (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139.)  Although the scope of inquiry when a criminal defendant is impeached with evidence of a prior felony conviction generally does not extend to the

facts of the underlying offense, the defendant opens the door to questioning about the facts of the prior conviction if he or she seeks to mislead the jury or minimize the facts of the prior conviction. (*People v. Shea* (1995) 39 Cal.App.4th 1257, 1267.)

Anderson opened the door to questioning about the facts underlying his 1989 robbery conviction in two ways. First, he volunteered on cross-examination that he was not "familiar with guns" and that he did not know anything about guns. Given that testimony, it was proper for the court to allow the prosecutor to question Anderson about his use of a shotgun in the 1989 robbery, as well as his gun possession in 2000, because evidence of Anderson's prior gun use tended to contradict his denial of familiarity with and knowledge of guns. The court could reasonably have viewed Anderson's denial of any knowledge about guns as an attempt to mislead the jury.

Second, when the prosecutor questioned Anderson about his use of the shotgun in the 1989 robbery, Anderson initially asserted that he "never used the gun." Anderson's denial that he "used" the shotgun during the robbery opened the door to questioning about specific facts regarding his use of the shotgun, including the fact that he threatened the store manager and held her on the ground with the shotgun. Although defense counsel did not object to the prosecutor's questions about Anderson's specific use of the shotgun, if defense counsel had done so, it would not have been an abuse of discretion for the court to overrule the objection. Evidence of Anderson's specific use of the shotgun during the robbery contradicted his denial that he had used the gun in the robbery and, as with his denial of knowledge about guns, the court could have reasonably viewed his

25

denial of having used the gun as an attempt to mislead the jury. The court did not err in admitting Anderson's testimony regarding his prior gun use and possession for purposes of impeachment.[9]

   2.    *Defense counsel's failure to object*

Anderson contends that his counsel rendered ineffective assistance by failing to object to the prosecutor's irrelevant examination, which he maintains was designed to open the door to evidence about Anderson's prior gun use and possession. Anderson further contends that the trial court should have sua sponte given a contemporaneous limiting instruction prohibiting the jury from considering evidence of his prior gun use and possession for any purpose other than to impeach his testimony, and suggests that his counsel was ineffective for failing to request such a limiting instruction.

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.) Since the failure of either

_____

[9]     The prosecutor's questioning regarding Anderson's use of the shotgun in the 1989 was more protracted than necessary to impeach Anderson's credibility, and pushed the limits of appropriate—as opposed to unduly prejudicial—cross-examination. The court would have acted well within its discretion in cutting off the prosecutor's questioning earlier than it did. (*People v. Hamilton* (2009) 45 Cal.4th 863, 943 [trial court has wide latitude to restrict cross-examination that is prejudicial].)

prong of an ineffective assistance of counsel claim (defective representation or prejudice) is fatal to establishing the claim, we need not address both prongs if we conclude that appellant cannot prevail on one of them. (*People v. Cox* (1991) 53 Cal.3d 618, 656, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, and superseded by statute on other grounds as stated in *Jones v. Superior Court* (1994) 26 Cal.App.4th 1202, 1210; *Strickland v. Washington* (1984) 466 U.S. 668, 697.)

We conclude that Anderson has not met his burden of showing that he was prejudiced by either his counsel's failure to object to the prosecution's cross-examination that led to the admission of the evidence of his prior gun use and possession, or by the omission of an instruction limiting the jury's use of that evidence to evaluating his credibility. Anderson's initial statements that he was not familiar with, and had no knowledge about, guns were not responsive to questions that the prosecutor posed on cross-examination. Rather, Anderson volunteered those statements in response to a question about whether his cell phone case and knife looked like a gun in a photograph— a question that was relevant to his testimony on direct examination in which he suggested that Ireland had mistaken the cell phone case and knife for a gun. Thus, there was no question about his gun knowledge for defense counsel to object to at the time Anderson volunteered that he had no knowledge about guns.

As discussed above, Anderson's assertions that he lacked knowledge about guns opened the door to the prosecutor's questions about his use of a shotgun in the 1989 robbery and his gun possession in 2000, and his denial that he had used the shotgun in the

27

robbery opened the door to questions about his specific use of the shotgun. Consequently, it is not reasonably probable that the court would have sustained objections to either line of questioning. The likelihood that such objections would have been unsuccessful militates against a finding of ineffective assistance as well as a finding of prejudice. "It is well settled that counsel is not ineffective in failing to make an objection when the objection would have likely been overruled by the trial court." (*People v. Mendoza, supra,* 78 Cal.App.4th at p. 924.)

We reject Anderson's contention that the trial court erred by not sua sponte giving a limiting instruction regarding his impeachment testimony. Although the trial court generally has no sua sponte duty to instruct the jury regarding the admissibility or use of other crimes evidence (*People v. Falsetta* (1999) 21 Cal.4th 903, 924), the court in this case gave such a limiting instruction at the close of trial by instructing the jury with CALCRIM No. 316 as follows: "If you find that a witness has committed a felony or other misconduct, *you may consider that fact only in evaluating the credibility of the witness's testimony.* The fact that a witness may have committed a felony or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." (Italics added.)

"Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The trial court did not err by failing to instruct the jury sua sponte to

28

limit the use of the evidence of Anderson's prior offenses to determine his credibility. The instruction that the court gave adequately covered that point. The fact that the court gave the instruction at the close of trial instead of contemporaneously with the cross-examination in question does not constitute error or prejudice. (*People v. Hughes* (1975) 50 Cal.App.3d 749, 754 [court's failure to give a limiting instruction immediately after defendant admitted prior convictions did not require reversal where the jury was adequately apprised of the limited purpose for which the evidence of the prior felony convictions could be considered at the close of trial].)

The court's instruction with CALCRIM No. 316 negates Anderson's ineffective assistance claim to the extent that the claim is based on his counsel's failure to request a limiting instruction. In addition to the court's instructing the jury with CALCRIM No. 316, defense counsel in closing argument addressed Anderson's prior robbery and gun use convictions and admonished the jury that "[t]he reason that evidence came out was so that you could consider it as far as his credibility, not as far as whether he committed this offense or not." In light of the court's instruction and counsel's admonition about the limited use of Anderson's prior convictions, it is not reasonably probable that Anderson would have received a more favorable outcome if the court had given the jury a limiting instruction contemporaneously with his impeachment testimony. Anderson's claim of

ineffective assistance of counsel fails because he has not shown that he was prejudiced by his counsel's alleged deficient performance.[10]

D.    *Sentencing Error*

Anderson contends, and the People concede, that his sentence for burglary should have been stayed under section 654's prohibition against multiple punishment for crimes arising out of a single act.  The People also correctly note that because the sentence on the burglary count must be stayed, the firearm-use enhancement imposed on that count under section 12022.5, subdivision (a), must also be stayed.  (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709 ["Where the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed"], disapproved on another point in *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130, fn. 8.)  We therefore remand the matter to the trial court to stay, under section 654, sentence on the burglary conviction (count one) and the firearm enhancement imposed on that count, and to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

IV.

DISPOSITION

The trial court is directed to correct the abstract of judgment to reflect that the sentence on count 1 and the firearm enhancement imposed on that count under section 12022.5, subdivision (a) are stayed under section 654, and to forward a copy of the

---

[10]    Having rejected Anderson's claims of substantive error upon which he bases his claim of cumulative error, we necessarily reject his claim of cumulative error.  (*People v. Brents* (2012) 53 Cal.4th 599, 619-620.)

corrected abstract to the Department of Corrections and Rehabilitation.  In all other

respects the judgment is affirmed.


                                                                    AARON, J.

WE CONCUR:


_____
McCONNELL, P. J.


_____
IRION, J.

31